[No. 19025. Department Two. May 6, 1925.]

L. J. HULL, *Respondent,* v. C. B. MYERS, *Defendant,* E. B. DUDDEN, *Garnishee-Defendant,* BANK OF ALASKA, *Intervener-Appellant.*[1]

PLEDGES (3)—DELIVERY TO AGENT AS TRUSTEE—EVIDENCE—SUFFICIENCY. A pledge of canned clams was clearly established where, pursuant to agreement by a bank to finance the canning of clams in Alaska, the bank advanced funds to the shipper on notice of a shipment to the named trustee, who was to receive the clams and dispose of them and account to the bank for all advances made.

Appeal from a judgment of the superior court for King county, Hall, J., entered August 27, 1924, in favor of the plaintiff, in garnishment proceedings, tried to the court. Reversed.

*Roberts & Skeel* and *J. J. Geary,* for appellant.

*Guie & Halverstadt* and *Jno. J. O'Brien,* for respondent.

TOLMAN, C. J.—Respondent, as plaintiff, brought this action to recover upon an indebtedness due him from the defendant, Myers, and caused a writ of garnishment to be issued and served upon the garnishee defendant, Dudden. In due time, the garnishee answered, admitting that a certain number of cases of canned clams had been received by him to be sold, and that the clams, or the proceeds of the sale thereof, were then

[1]Reported in 235 Pac. 786.

in his possession, but denied that the principal defendant was the owner of, or entitled to, either. The plaintiff in the action controverted this answer, contending that the defendant, Myers, was the owner and entitled to the proceeds of the sale of the clams, and that therefore they were subject to the garnishment. Later, the appellant, the Bank of Alaska, intervened, claiming to be the owner and entitled to the proceeds of the clams. Judgment by default was taken against the principal defendant for the full amount claimed, and thereafter the issues raised by the contravention of the garnishee's answer and the complaint in intervention were tried to the court, resulting in findings to the effect that, at the time of the service of the writ of garnishment, the garnishee had in his possession and under his control 136 cases of clams belonging to the defendant Myers; that the garnishee had sold the clams and received as the net proceeds the sum of $1,360, from which certain deductions should be made for advances made by the garnishee, leaving a balance in his hands, for which he was accountable, of $1,186.40; from which the court concluded that the plaintiff was entitled to judgment against the garnishee in that sum, and judgment was entered against the garnishee for that amount, less $50 allowed him as an attorney's fee.

The question presented appears to be wholly a question of fact. It appears that the defendant Myers and one Carl, in the spring of 1923, entered into a partnership to engage in the business of packing clams in Alaska. To finance their undertaking, they sought assistance from the Bank of Alaska. In April, before either partner went to Alaska, and before the season's operations were commenced, they met and conferred with the president of the Bank of Alaska in Seattle, and made arrangements with him under and by which the Bank of Alaska agreed to finance their operations

in the following manner: The partnership was to pack the clams and ship them to Dudden, who was afterwards garnisheed, the bills of lading, as soon as the clams were shipped, to be delivered to the bank, upon receipt of which the bank would and did advance to Myers and Carl seventy per cent of the value of the clams. By the bills of lading, the clams were to be delivered to Dudden at Seattle, and he was to sell the same and deposit the net proceeds in a Seattle bank to the credit of the Bank of Alaska. The evidence, without contradiction, shows that this course was followed and that the bank's advances, not repaid, largely exceed the amount now in the hands of the garnishee.

Ordinarily, and generally, the partnership shipped the clams in the name of the Bank of Alaska, the bills of lading thus indicating title in the bank; but in the particular shipment now in controversy it appears that for some reason the usual course was not exactly followed. On July 8, 1923, just before this shipment was loaded, Myers wired the Bank of Alaska, "I am billing today 136 cases of whole razor clams for the steamer Watson." The bill of lading was issued three days later, reciting that 136 cases of clams were received from C. B. Myers consigned to E. B. Dudden, the bill being signed, "Anderson Dock Co., Shipper." A duplicate of this bill of lading was sent to the Bank of Alaska and the bank made the usual advances upon its receipt. Just why the shipment was not made in the name of the bank, or why the bill of lading recited that the goods were received from C. B. Myers, and why it was signed by Anderson Dock Co., as shipper, is not clearly explained. Mr. Myers had died prior to the trial and his explanation of these matters could not be had. Mr. Carl was not present at the time the shipment was made and was not allowed to testify as to what he supposed caused the departure from the

usual course. It seems apparent, however, that the departure from the usual course was one of oversight, rather than of intention; that it was not intended to change the relationship or the rights of the parties, and in fact no such change was effected, because the bank, upon receipt of the duplicate bill of lading, made the usual advances.

Considerable argument is indulged in to the effect that the bank, in making advances upon such a bill of lading, did so at its peril, and that it had no more than a general claim against Carl and Myers for the money so advanced. It does not seem necessary to follow counsel in this and similar arguments. The testimony clearly shows that in Seattle, prior to the beginning of the season's operations, it was clearly and explicitly agreed among all parties that the shipment should be made to Dudden for the purpose of selling and depositing the proceeds in a Seattle bank to the credit of the Bank of Alaska; and, whatever the form of the bill of lading, or even if there were none, the goods now in controversy were so shipped strictly in accordance with the agreement; were so received by the agent, upon the well-defined and understood conditions, and he did not become liable to Myers by reason thereof, but his only liability was under the preceding contract to sell the clams and deposit the proceeds in bank to the credit of the Bank of Alaska.

The trial court seems to have been misled by the fact that, long after these goods were shipped to the agent Dudden, and on November 20, 1923, the bank cabled Dudden, calling attention to various shipments, but failing to mention this particular shipment, and then proceeding, "All these clams are ours and we hereby make demand on you as our agent for all proceeds from same, less your regular commission and any freight charges you paid on same to Seattle," and

respondent seems to contend that, because no mention is made of these 136 cases in that cablegram, it is very strong proof that they were not shipped by or for the bank, and that it had no interest therein. While, under some circumstances, this evidence might have weight, we cannot hold that it here has sufficient weight to overcome the clear, positive and uncontradicted testimony in the case as to the previous arrangements and the compliance therewith. Since the testimony of the bank's officers was taken by deposition prior to the trial, there is no explanation from them as to why this cablegram was sent or why the shipment of 136 cases was not mentioned therein; but, in the light of the clear testimony as to the original arrangements, we cannot hold that the cablegram indicates anything other than an inadvertence or an oversight as to the shipment of the 136 cases.

It seems to us that this is a clear case of a pledging by Carl and Myers of their product, the delivery thereof to the agent, who was agreed upon as a trustee to hold and handle the property pledged, and, since the bank made its advances on the faith of the pledge, a valid pledge was thus consummated. Carl and Myers parted absolutely with possession, which was vested in the agent, and the pledged property was placed wholly beyond their control. We think that here there was clearly sufficient delivery, under the law, as discussed and defined in *Ackerson v. Babcock*, 132 Wash. 435, 232 Pac. 335, to make a completed pledge; and the judgment of the trial court is therefore reversed, with directions to enter judgment in favor of the intervener, establishing its rights to the net proceeds of the sale of the clams in question.

FULLERTON, HOLCOMB, MITCHELL, and MACKINTOSH, JJ., concur.